Starns et al vs. Hadnot et als.

---

No. 10,986.

### C. H. STARNS ET AL. VS. LAVINIA A. HADNOT ET ALS.

1. Where the notary before whom a marriage contract is alleged to have been executed, and which contract is averred to have been destroyed by fire, deposes that he remembers perfectly the act and its execution—that it declared that the parties thereto were about to be married, and that in view of the contemplated marriage had agreed there should be no community between them; that the act was passed by him, duly signed by the parties and duly witnessed and recorded, proof of the fact that the parties were not married when the act was passed rests upon the recitals of the act of which the notary testifies he has a distinct recollection.  These recitals bind both the parties and their heirs to their verity.  The force of this testimony is not weakened because at another point in his testimony he stated that he knew the parties were not then married, because they came together to his office before the act was passed and told him they were about to be married, and the character of the act they desired passed.  This fact, together with others specified, were simply explanatory of the vivid recollection of the witness of this particular act.

2. If a marriage contract be proved to have been executed before the celebration of the marriage, the precise day of its execution is immaterial.  Time is of the essence of the contract only with reference to its being prior to the marriage.

3. In a contest between the heirs of a wife and those of a husband, where the plaintiffs and defendants are all children of the same mother, though by different husbands, the issue being whether or not the second marriage was contracted under a marriage contract, the declarations of the wife during the second marriage that such was the fact are admissible in corroboration of the testimony of the notary before whom the contract is alleged to have been

passed, to the effect that such a contract was executed before him. A proper foundation for the introduction of secondary evidence, as in case of a destroyed instrument, having been laid, the testimony of the notary and the declarations of the wife were both admissible.

4. The husband of one of the heirs of a succession can testify for or against a co-heir touching the latter's interest in the succession. Boisse vs. Dickson, 31 An. 741.

5. Although the judge may have charged improperly, yet, if the evidence would not have authorized a different verdict, it will be upheld. 7 An. 678; 10 An. 150.

6. As an act bad for one purpose may be good for another, the judgment rendered in a case may be pronounced an absolute nullity for want of jurisdiction, and yet the record therein may be legally admissible in another suit. The pleadings may contain admissions, or the rights of parties may otherwise be legally affected.

7. A court can not assume, for the purpose of excluding from being admitted in evidence, the record of a suit in which a wife appears as a plaintiff, acting in her own interest and adversely to her husband, that the suit is really one in the interest of her husband; that the allegations of the petition are admissions in favor of her husband and really his own allegations. Charges to that effect can not be brought to bear by way of objection to evidence. The court was not called on to stop the trial of the case and try separately issues raised by such objections.

APPEAL from the Twelfth District Court, Parish of Grant. Coco, J.

---

*R. J. Bowman*, for Plaintiffs and Appellants, cited: C. C., Art. 2281; 21 An. 922, 343, 651; 23 An. 556; 1 Peters, 591, 599, 600; 2 N. S. 666; 3 N. S. 636; C. P. 516; 5 R. 78; 8 R. 236.

---

*White & Thornton*, for Defendants and Appellees, cited: C. C., Arts. 2325, 2328, 2329, 2332; 31 An. 110; 25 An. 429; 25 An. 426, 201; 27 An. 393; 12 R. 31; 4 An. 337; 32 An. 325; C. C. 2386, 2396, 2392-3-4-5.

---

The opinion of the court was delivered by

NICHOLLS, C. J. The plaintiffs, Charles H. Starns, George L. Starns and Philip Ursory, urge that the two former are the children of Martha E. Starns, and that the said Ursory is the heir of his deceased child, George Ursory, the issue of his marriage with Margaret A. Starns, the daughter of the said M. E. Starns; that Margaret A. Starns died leaving the said minor her sole heir, and the said minor died about the year 1886, leaving the said Ursory her sole heir.

That, subsequent to the death of her first husband, the father of C. H. and G. L. Starns and of the wife of Philip Ursory, the said M. E. Starns married Alfred C. Lewis, on or about the 30th November, 1856; that at the time of that marriage she owned a number of slaves and personal property, consisting of cattle and household furniture; that immediately after her marriage, Lewis moved all of said property to his plantation in Grant parish, where he and his wife resided until their respective deaths. That the said Lewis worked his farm with the joint labor of the said property belonging to his wife and his own, which consisted of about the same number of slaves and work stock, with the slaves until 1866 and with the stock until it was worn out; that Lewis had only two milk cows and calves, which were mingled with those of M. E. Starns, and the increase of said joint stock, at the death of M. E. Starns, amounted to about one hundred and sixty head; that at the death of the said Mrs. M. E. Starns, the community property between her and her husband Lewis consisted of a plantation on Red river in the parish of Red river, consisting of about thirteen hundred and nineteen acres of land, also the undivided half of a plantation on Red river, in the parish of Rapides, known as the Corinne plantation, besides a number of mares, horses, colts, work stock and cattle; that Lewis failed to have any inventory made of the property of his wife at her death, but took possession of all of said community property as well as what remained of the property owned at their marriage; that he sold a portion of the cattle and left a portion, which with the said plantations have been taken possession of by her heirs and used by them; that the rent of the plantation in Red river parish has been worth twelve hundred dollars a year from 1876, and that of the undivided half of the plantation in Rapides parish one hundred |dollars per annum; that the cattle were worth twelve hundred dollars at the time they were disposed of, and would have been worth at the time of his death a much larger amount; that the work stock, mares and colts were worth six hundred dollars.

That Lewis left the following children, issue of his marriage with petitioner's mother: Lavinia A., wife of John P. Hadnot; Luella D., wife of H. G. Goodwin, and Joseph P. and Alfred W. Lewis, and three minor children, issue of his marriage about the year 1880 with Julia Ferrand. The plaintiffs prayed that these parties be cited, and the said heirs of A. C. Lewis be decreed to account to the said com-

munity for the rent of the plantation in the parish of Red River, at $1200 a year, and for the rent of the undivided half of the plantation in Rapides at $100 per annum, and for the rent of each from 1876.

That the estate of A. C. Lewis be also decreed to account to the said community for the cattle, at the value of $1200, with 5 per cent. per annum interest from the time they were sold or disposed of by A. C. Lewis, for the work stock, mares and colts, at $700, with like interest, and that said community be partitioned, for trial by jury, and for general relief.

Defendants first pleaded the general issue. They then alleged that the property claimed to be community, and sought to be partitioned, was and is the separate property of the late A. C. Lewis, and that it was not and is not community property, as the plaintiffs have declared. That the said Alfred C. Lewis and Widow Martha E. Starns, their father and mother, just previous to their marriage, made and entered into a marriage contract, by and in which it was stipulated and contracted that no community of acquets and gains should exist between the contracting parties or future spouses, and that their property should be separate. That said contract was executed before Rosemond Le Gras, then a notary public in and for the parish of Rapides, on or about the 29th day of November, 1856, and that it was forthwith deposited by the said notary in the recorder's office of Rapides parish, was duly recorded, and there remained, until it, together with the court house of that parish and all the records of said parish, were destroyed by fire in 1864. That the marriage contract was sought to be re-established in 1868, and was so re-established by a decree or judgment of the District Court of Rapides, in the year 1870, under the law providing for the re-establishment of the lost records by the said fire in 1864.

That their mother died in the year 1876, leaving no property. That before her death, and in view of that event, she divided in kind all the property she owned and possessed, between her two sets of children and heirs, and that the plaintiffs then received and accepted their full part and share of all their mother's property, and that they never claimed or pretended to claim or set up any other or further rights to any other property than that so divided by their mother and so accepted and received by them until after the death

of Alfred C. Lewis in the latter part of the year 1889, and that their pretensions are stale and without foundation. They, therefore, prayed that plaintiffs' demand be rejected.

Before the trial in the lower court the parties entered into an agreement to the effect that " they shall at this trial try only the issue whether there was an ante-nuptial contract between Alfred C. Lewis and Martha E. Starns regulating the community of their marriage, and that all other issues in the case are to be held in abeyance."

The special issue so submitted to the jury by consent, was by a division of nine to three in that body, determined in favor of the defendants, whereupon the District Court rendered a judgment that " there is and was no community of acquets and gains existing between the late Martha E. and Alfred C. Lewis, and that plaintiffs' demand be rejected at their costs."

It was admitted between the parties that A. C. Lewis and Martha E. Starns were married on the 30th of November, 1856; that Mrs. Lewis died on the 22d of December, 1876, and that Mr. Lewis died on the 16th of December, 1888; also that the notary who passed the act did not make or keep a copy of the marriage contract or any of his acts, and that there is no copy of said marriage contract in existence.

In support of the position that there was a marriage contract between their father and mother, stipulating there should be no community and their property should be kept separate, defendants offered first the testimony of Rosemond Le Gras, the notary public, who, it is alleged, passed the marriage contract, taken in New Orleans under commission. Le Gras testified as follows: " I was a resident of Alexandria, La., during the year 1856; I had resided there continually from 1830 to 1863. During that period I was mayor of the town, justice of the peace and notary public. I occupied those positions at different times and held that office for several years. I was intimately acquainted with Alfred C. Lewis; was also acquainted with Mrs. Widow Martha E. Starns, both of Rapides parish; knew them in 1856·and before that year, and I know that they did become husband and wife in the year 1856. They entered into a marriage contract before me as a notary public. Both parties were present and signed the marriage contract. It was witnessed and regularly drawn. I do not remember the witnesses

at this time, but my impression is strong that W. B. Hyman, then attorney at law at Rapides parish, La., and afterward Chief Justice of the State of Louisiana, was one of said witnesses, because he was the attorney and legal adviser of the late Alfred C. Lewis and the Widow Starns. I remember distinctly that he was present when the marriage contract was passed and signed. It was stipulated in the marriage contract that there should be no community of acquets and gains; that each should hold and manage their own separate property. I remember these stipulations clearly. It was the object of the marriage contract between the parties. I do not recollect anything else in regard thereto excepting that it was a short act regularly witnessed and afterward recorded."

On cross-examination by the plaintiffs, he stated: "I left the parish of Rapides in the month of May, 1863, and have resided in Algiers, La., since that period, excepting two years that I resided near Amite, La. I knew it (the fact that A. C. Lewis and Martha E. Starns were married) from general report, from Mr. Lewis telling me that they were married and from both telling me at the time that the marriage contract was executed that they were about to be married, and I never heard their marriage disputed. I became acquainted with the widow Starns some time before the marriage contract was executed between her and Mr. Lewis, but how long before that time I do not exactly remember. Wm. B. Hyman was the lawyer for the widow Starns some time before the marriage with A. C. Lewis and she used to come to his office to consult him; in that way I became acquainted with her. My office was at the corner of Second street and Bayou Robert road, in Alexandria, La., and Mr. Hyman had his office adjoining mine and directly in the rear. The entrance to his office was directly through mine. Nor can I remember now the exact date of her marriage with Lewis. It was a short time after the presidential election of 1856, and I think in the month of November, as well as I can now remember. Of course it (the marriage contract) was not signed after their marriage, but prior thereto. If they had told me that they were married, I should have told them it was useless to make a marriage contract. They both told me at that time that they were not married, but were about to be married. I have thought of all the circumstances attending the matter and I feel confident it is impossible for me to have been mistaken when I said the marriage contract was

executed and signed before the marriage was celebrated, and this because Judge Hyman, the legal adviser of the parties, was present and advising them of its execution, and because I also knew that it had to be signed before the marriage to be of any value, and of the parties telling me they were about to be married, and that they wanted their property to be kept separate and no community between them. I can not tell the exact date of the marriage contract, but am sure it was during cold weather and about the presidential election of 1856, that is shortly after said election, nor do I remember the day of the month and week nor the exact date that the wedding took place. I do not remember how long after the marriage contract was signed the marriage was celebrated. I was not present at the celebration of the marriage. The marriage contract was drawn and signed in my office at Alexandria, La. The Widow Starns and Mr. Lewis came into my office together and executed the act there. I do not remember to have read the act after it was recorded. No paper in relation to this matter has been sent me by any one that I have received. About the 24th or 25th of last April, 1889, Mr. H. G. Goodwin brought me a letter of introduction to my house, in Algiers, from Judge M. Ryan and John Clements, both of Alexandria, La. Goodwin at that time showed me a copy of a judgment rendered by Judge Osborne in the Rapides District Court. This judgment revived the marriage contract I had drawn between Mr. Lewis and the Widow Starns. The original contract it stated had been burned. That was the only paper he showed me except the letter of introduction, above mentioned. The only letter I have received is the letter of introduction hereinbefore referred to. The only paper shown me or which I have read was the judgment referred to in my answer to cross-interrogatory No. 9 and shown me by Mr. Goodwin. Mr. Goodwin is the only person I have seen or heard from in relation to the matter. I do not remember to have read said marriage contract since I caused it to have been recorded, over thirty-two years ago, but the recollection of that marriage contract had not faded from my memory. On the contrary I have a distinct recollection of it and the execution, because it was the *first* and *only* marriage contract I executed during the period of my notarial office, and being also well acquainted with the parties, and my recollection of it has not been influenced in the slightest degree by the letter of introduction or the judgment of Judge Osborne, or the interview I had with

Mr. Goodwin.    Before Mr. Goodwin showed me the judgment I told him that I had a perfect recollection of the marriage contract, and it is not through anything he said or showed me that I give the date of said marriage contract.    The marriage contract, as I have before stated, was not a long one.    It declared that in view of the fact of the marriage about to be celebrated between them they were desirous of forming a marriage contract, and to that end had agreed that there should be no community of acquets and gains between them; that their property should ever remain separate.    It made no provisions or statements of the kind of property that each of the parties had, or stipulations or agreement made about the husband taking the property of the wife, but to the contrary, each should retain and manage their separate property.    Nothing was said about how the expenses of the family or household were to be borne.    As before stated, I was not present at the wedding, but their marriage was one of public notoriety and well known in town, and Mr. Lewis told me that the marriage had been consummated.    I remember shortly after I had drawn the contract of asking Mr. Lewis:  'Have you consummated your marriage?' and was informed by him that he had.''

We have transcribed this testimony in full, for the reason that the case turns principally upon it, and that its reception by the court was made the subject of a bill by the plaintiff, the exceptions raised to this testimony being leveled at Le Gras' answers to the fourth and fifth interrogatories, stating '' the marriage contract was before marriage,'' on the ground that the said answers show they are impressions and not facts within the knowledge of witness; also upon the ground that the date of said contract is a part of the contents of said contract, and its contents can only be proved by knowlege derived from having read the instrument, from a knowledge of its contents, and on the further ground that no fact contained in the contract, nor any future event, can be proved by the declarations of the parties at the time made, or before the contract was executed.

We see no force in the objections urged.    It would be difficult to find testimony more direct and positive, and more clearly resting on a witness' own knowledge.    He stated that the parties went together to his office for the purpose of having the act passed; that being so together they both told him they were about to be married, and they wanted their property to be separate and no community

between them; that the act was passed by him; that he had a distinct, and, as he says, a perfect recollection of the act and its execution; that it (the act) declared that in view of the fact of the marriage ABOUT *to be celebrated* between them they were desirous of forming a marriage contract, and to that end had agreed that there should be no community between them; that their property should forever remain separate; that the act was signed by the parties, was duly witnessed and duly recorded.

It will thus be seen that Le Gras remembers, as an independent, substantive fact, that the same statement which they had made to him prior to the passage of the act, that they were *about to be married*, was embodied in the act itself as one of its recitals, with the further recital that the act was passed in view of that contemplated marriage. The proof of the fact that the marriage was *not yet consummated* does not, as plaintiffs suppose, rest upon the antecedent declarations of Mrs. Starns and Lewis to Le Gras, but upon the recitals of the act itself, to the verity of which the heirs of each and both are bound. C. C. 2236.

It is true that Le Gras refers to the declarations of the parties just prior to the act in connection with other facts, but he does so simply by way of explanation and as assigning reasons why his memory should have been so retentive as to this particular act.

Mrs. Goodwin, the oldest, and Mrs. Hadnot, the second, of Lewis' children, and John P. Hadnot, his son-in-law, were placed upon the stand by defendants to corroborate Le Gras, and each testified to having heard Mrs. Starns say several times that there was a marriage contract, and that she was married under a marriage contract.

The testimony was excepted to so far as the daughters were concerned, on the ground that the declarations of the wife during marriage are not admissible in a suit of the heirs of the husband against her heirs by a former marriage, and so far as the son-in-law was concerned, on the ground that his wife's interest was inseparable from that of her co-heirs. The court overruled the exceptions as to the daughters, and admitted Hadnot's testimony, but solely as evidence on behalf of the co-heirs of the wife.

The plaintiffs reserved a bill.

The present suit not being one between Mrs. Lewis and her husband, but a litigation involving a settlement of the rights *inter se* of two sets of children, all of them children of the same mother, and

the object of the testimony being merely to establish facts corroborative of the testimony of Le Gras, we think that the declarations of the mother were admissible for that purpose. 6 An. 172; 14 An. 324.

In permitting the testimony of Hadnot to be introduced for the purpose it was offered, and in the restricted manner it was, there was no error.

In Boisse vs. Dickson, 31 An. 750, this court held that "the husband of one of the co-heirs can testify for or against a co-heir, or for or against a creditor of a co-heir, touching the latter's interest in the succession."

Defendants offered in evidence a certified copy of the record and the judgment therein in a suit of Martha E. Starns vs. Alfred C. Lewis, her husband, No. 1426 of the District Court for the parish of Rapides, reviving the marriage contract between herself and her said husband, and certificate showing that said judgment was recorded in the mortgage book of Rapides parish, on the 17th March, 1871, as *rem ipsam*, and for the purpose of proving that it stood on the public records as a contract between the parties during their lifetime until it was annulled in 1891.

Defendant objected to the same on the ground "that the judgment rendered was declared an absolute nullity by the Supreme Court, and that as *rem ipsam* it is inadmissible because it is.wholly irrelevant to the issues in this case; also that the declarations of the wife made in favor of the husband during the marriage are inadmissible against her or her heirs in a contest between the heirs of the wife and the heirs of the husband, and that the allegations of the petition in that suit are the allegations of Alfred C. Lewis, and not of Mrs. Lewis, which plaintiff offered to prove by the deposition of M. Ryan." The court overruled the objections and the defendant excepted.

It does not follow as the result of a decree pronouncing a judgment to be an absolute nullity, that the pleadings, record and judgment should thereafter become absolutely worthless for all purposes as evidence. That an act bad for one purpose may be good for another has been frequently decided. A familiar illustration of this is found in the matter of prescription which a judicial demand interrupts, although instituted in a court without jurisdiction and dismissed on that ground. Assuming it to be true, as charged in plaintiffs' exception, that the declarations of a wife made in favor of

her husband during the marriage are inadmissible against her or her heirs in a contest between the heirs of the wife and the heirs of the husband, the allegations of the petition introduced in this case do not *show on their face* any *declarations of the wife in favor of her husband;* so far from this, she was (apparently, at least) as a plaintiff acting adversely to him and in her own interest. Whether as a matter of fact, it was to her advantage or not, at the time the petition was filed to have claimed there was no community between herself and her husband we are not prepared to say. We can not collaterally, on a mere question as to the admissibility of the record in evidence, act upon an assumption that such a position then taken would inure to her husband's benefit and work to her harm. For the same reason we can not presume that the allegations of the petition are not her allegations, but those of her husband.

It would appear that the district judge was not willing to stop the trial of the case and enter into an examination of that side issue, and no exception was taken to this exercise by him of his discretion in the manner of conducting cases before him. Plaintiffs were subsequently given an opportunity to introduce testimony in support of their contention on that subject. We do not think the record was irrelevant. What effect was to be given to it, was a different matter —one which the court could not prejudge. The annulling of the judgment for want of jurisdiction in the Rapides court, did not undo the effect of the petition if it contained admissions or took positions inconsistent with those now advanced by the plaintiffs. As we have said, on its face, it is a petition in the name of the mother of all these parties, in which she affirmatively states the prior existence of the marriage contract and its destruction by fire, and makes its reestablishment or revival her cause of action in the case. Independently of this, the record was relevant in support of the position taken by the defendants, that plaintiff's demand was stale, and that they purposely delayed questioning the existence of the marriage contract for years after their mother's death, and until after that of their stepfather, Lewis.

But whilst the record was legally admitted in evidence, it may be well to say that the decision in this case has not been made to rest upon anything in it. Defendants introduced other testimony to which we do not deem it necessary to specially refer. Plaintiffs rely mainly upon the testimony of Judge Ryan, that of

Thomas and of George Cannon, and that of Mrs. Gregory and of G. L. Starns. Judge Ryan's testimony was to the effect that he was the attorney who brought the suit of Starns vs. Lewis (the revival suit), that A. C. Lewis employed him, that he did not remember to have seen the plaintiff in that suit and that he learned the facts set forth in the petition therein from A. C. Lewis.

G. L. Starns, one of the plaintiffs, testified that his mother had never told him anything about a marriage contract between herself and Mr. Lewis, and he had never heard her mention it to any one. Thomas Connor, one of the brothers of Mrs. Lewis (Starns), testified that his sister did not go to Alexandria at any time with Mr. Lewis before her marriage, that she did not go there with any one during or from the first visit of Mr. A. C. Lewis before her marriage, nor by herself during that period; that his sister was married at their mother's house and he was at the wedding; that there was no marriage contract passed between them before the wedding; that he never heard any marriage contract talked about or mentioned during any time of the marriage in the family; that he saw his sister often after her marriage; saw her once or twice a year, and visited her at her home in Grant parish; that she visited her mother after her marriage, the first visit after her marriage being one of about seven weeks; that was about twelve months after her marriage; that he did not recollect how often she visited her mother after that; that he accompanied her on those trips, coming and going; that she was intimate with him as brother and sister; that she never mentioned to him at any time during those trips, or while at her mother's, that there was a marriage contract between herself and A. C. Lewis; she never mentioned it in his presence. That his sister's slaves and property were taken to Mr. Lewis' home; that the slaves and stock were at work on his farm every time he went to Mr. Lewis'; that he supposed Mr. Lewis worked them, as they were on his farm and he having charge of them at the time; that he was born in September, 1840; that he had gone several times with his sister to Alexandria before her marriage with Mr. Lewis; sometimes she would go there to purchase goods; that he was present at the wedding of his sister and Mr. Lewis; that he stated there was no marriage contract, because he was present at the wedding and that was the reason he so stated; that if there had been a marriage contract, of course he would have seen cer-

tainly; that was the only reason he had for saying there was no marriage contract between his sister and Mr. Lewis; that he never heard his sister or Mr. Lewis say anything about a marriage contract; that his sister could not have gone to Alexandria during the period from Mr. Lewis' first visit until her marriage to him without he or his brother knowing it; that one or the other always accompanied her.

The testimony of George Cannon was substantially the same as that of his brother, but less positive as to his sister not having gone to Alexandria prior to her marriage and after her engagement to Mr. Lewis—on which point he said: "She did not go there with Mr. Lewis during any time that he was addressing her that he knew of or remembered; she did not go there with any one else that he knew of during that time. When she went to Alexandria the witness sometimes went with her, and when he did not go, his brother went; he never knew of her going alone." He made the same statement which his brother did as to his sister having never mentioned to himself or in the family that there was a marriage contract between herself and Mr. Lewis. He declared there was no marriage contract executed between his sister and Mr. Lewis at the time of their marriage—that there was none made at his mother's at any time before the marriage, and he did not know of any made anywhere. Referring to this statement in the latter part of his testimony he said that he stated there was no marriage contract because he saw nothing performed at the time of the marriage except the ceremony by the minister; that a marriage contract is done before a notary public and there was no notary public there at the time of the marriage; that his reason for saying there was no marriage contract was because there was no notary public and no act passed at the time of the wedding that he saw—those were his reasons for saying so; that he was eighteen years old, and he thought he would have known a marriage contract if he had seen one. He subsequently added: "The fact that his sister did not go to Alexandria was another reason why he stated there was no marriage contract." This witness was the oldest brother of Mrs. Lewis. The sister, Mrs. Gregory, merely stated that she was at the wedding, and that Mrs. Starns never told her anything about a marriage contract.

Before stating our own conclusions in the case, we are called upon to notice the bill of exceptions taken by the plaintiff to the judge's

·charge to the jury. The bill declares that on the trial of the suit the court charged the jury that they must believe the one who swears affirmatively to the existence of a fact, to the testimony of one or more witnesses who swear negatively, and that the illustration of the defendant's counsel of this principle was most happy; and that if A, B, C and D are standing on the street, and A testifies that he saw E pass them and B, C and D testify that they did not see E pass, their testimony is of the weakest negative character and does not disprove the fact of E's passing them. A's testimony on the other hand is not only affirmative but conclusive proof of that particular fact—E's passing them. The district judge on this subject says: " When instructing the jury as to the effect they should give to certain testimony, the court charged the jury that affirmative testimony should outweigh negative testimony; and I gave them the reasons of the law therefor. I also instructed them that positive and conclusive evidence was that which established conclusively the matter in dispute; that to rebut that kind of proof, it required evidence of equal dignity, and I gave as one of the illustrations A, B, C and D are standing on the street; A testified that he saw E pass; B, C and D testify that they did not see E pass. Their testimony is of the weakest negative character. A's testimony, on the other hand, is not only affirmative, but conclusive proof of that particular fact. I further said that counsel representing the defendants had presented them in his argument a happy illustration of this rule of evidence

It was necessary to thus clearly present this legal construction of evidence to the jury, and it was perfectly pertinent to the case on trial. Le Gras, the notary before whom the ante-nuptial contract had been executed, had sworn positively to its execution. Other witnesses swore that though they were present at the wedding they saw no such contract entered into and signed by the contracting parties. This evidence was negative and weak, and it was proper to place a parallel case before the jury that they might appreciate its character and force, and this had to be done without comment upon matters or facts in the case about to be given them.

Plaintiffs' ground of exception was " that the jury are the exclusive judges of the facts and the weight of testimony, and the court is not permitted to comment on the evidence."

We can readily imagine a case in which this charge as to affirmative and negative testimony, with the broad statement made by the

judge, without qualification or explanation as to the conclusive force of the former as against the latter, would not only be erroneous but so injurious as to necessitate either a new trial or an absolute reversal of the judgment, particularly when coupled with such direct approving reference by the court as was made here to what had been said by the counsel of one of the parties. The charge complained of is open to some criticism, but under the conclusions which we have ourselves reached with all the evidence before us we feel it our duty to close this protracted litigation.

This court has held that although the judge may have charged improperly, yet if the evidence would not have authorized a different verdict, it will be upheld. Stackpole vs. Wickham, 7 An. 658; N. O. Opelousás R. R. Co. vs. Lagarde, 10 An. 150; Hennen's Digest, p. 98, No. 27.

We do not see how, in the case at bar, the jury could have reached any other conclusion than that which it did.

Some stress is laid by the plaintiffs upon an uncertainty as to the precise day on which the marriage contract was executed. It is charged that there is a variance between that alleged and that sworn to. Defendants' claim is that the contract was an ante-nuptial contract, passed on or about the 29th November, 1856. Time is certainly of the essence of a marriage contract, but only to the extent of requiring that the execution of the act should antedate the celebration of the marriage. That fact being established, it is immaterial whether the contract was passed on one day rather than another.

Plaintiffs urge with great earnestness that the employment by Lewis of the wife's slaves, horses and mules on his own plantation in the making of crops is inconsistént with the idea of there being no community between the spouses. If in point of fact the marriage contract was executed, as we hold it was, the subsequent action of the parties did not alter the situation as to community rights. Lewis' succession may have come under some obligation from the facts stated, but if such there be, it is of an entirely different character from that asserted in plaintiffs' petition.

In rendering judgment in the case the District Court rejected plaintiffs' demand; the demand so rejected, under the agreement already referred to, between the parties, must be held, construed and limited to the demand as to the special issue submitted to the jury, and must apply to none other.

As was said by Judge Porter, in his closing remarks in the case of DeEnde vs. Moore, 2 N. S. 357: We have gone into this subject more at length than usual or necessary, not because we felt any doubts on the law (or the facts), but because it is important in the administration of justice not only that we should arrive at correct conclusions, but that we should also, as far as it is practicable, render the grounds on which we have come to these conclusions satisfactory to others.

For the reasons herein assigned, it is ordered, adjudged and decreed that the judgment of the District Court, with the construction and limitation herein placed upon it, be and the same is hereby affirmed, and the cause remanded to the District Court for further proceedings, at appellants' costs.